JAMES A. COOPER and KAREN B. COOPER, husband and wife, Plaintiffs-Appellees, *v.* THOMAS F. SCHMIDT and LORINNA J. SCHMIDT, husband and wife, Defendants-Appellants

NO. 8240

(CIVIL NO. 58272)

APRIL 7, 1983

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY BURNS, C.J.

Defendants Schmidts appeal the award to plaintiffs Coopers of (1) specific performance and (2) an attorney's fee. We affirm.

On April 18, 1978, the Coopers, as buyers, and the Schmidts, as sellers, executed a 1971 Hawaii Association of Realtors Standard Form Deposit Receipt, Offer and Acceptance (DROA) involving the Kaleialoha condominium apartment no. 409. The price was $68,500 payable in cash, $54,800 of which was to come from a "conventional first mortgage with a reputable lending institution at not more than 9 3/4% interest." The DROA designated "King Escrow" as escrow but did not specify any closing date.

In relevant part, paragraph 12 of the DROA is as follows:
12. SPECIAL CONDITIONS: . . . Property is to be traded to qualify as a tax free exchange under Section 1031 of Internal Revenue Code of 1954. Exchange agreement to follow. Seller has right to extend escrow up to 6 months. Sale not subject to Seller finding exchange property.

On May 12, 1978, the parties set up an escrow account with King Escrow Services Corporation.

On June 28, 1978, the Coopers and the Schmidts entered into a Land Exchange Agreement (LEA) involving the Kaleialoha apartment no. 409 and unspecified property to be acquired. The LEA provided that the acquisition and exchange was to be accomplished by August 31, 1978, but that the Schmidts had the unilateral right to extend that date to June 15, 1979.

Also on June 28, 1978, the Coopers and the Schmidts entered into an Escrow Agreement which recited that the parties had agreed that the Schmidts would convey Kaleialoha apartment no. 409 to the Coopers and that the Coopers would convey to the Schmidts "one or more parcels of real property of like kind as may be designated by the [Schmidts.]" Bank of Hawaii (BOH) was specified as the third party to the agreement but did not sign it. The Escrow Agreement provides in relevant part as follows:
1. The [Coopers], within 30 days hereof, shall deposit or cause to be deposited in escrow with BOH $68,500. in cash or the equivalent thereof satisfactory to the [Schmidts][.]

* * *

2.1(c) To the extent that the monies deposited in escrow have not been applied to the acquisition of Exchange Properties, then all such amounts not so applied shall be paid over to the [Schmidts] promptly after the expiration of the escrow period on August 31, 1978, (or such extended date as provided in the Land Exchange Agreement), upon conveyance of Kaleialoha #409 to [the Coopers], and this agreement shall terminate and be of no further force or effect thereafter except as th [sic] [the Schmidts'] right to recover any damages resulting from a default by [the Coopers], as provided in paragraph numbered 9 of said agreement.

\* \* \*

In the event [the Coopers do] not deposit into this escrow cash in the amount of the fair market value of Kaleialoha #409 but [do] deposit an unconditional loan commitment satisfactory to [the Schmidts], then the following provision should be filled in and escrow agreement should be executed by the Lender.

AND _____ a _____ corporation, havings its office and post office address at _____ _____, hereinafter called "Lender", in consideration of these presents and in order to induce the [Schmidts] to keep the Land Exchange Agreement and this Escrow Agreement in full force and effect, this _____ day of _____, 19_____, Lender hereby acknowledges that it has issued to [the Coopers] an unconditional commitment in the amount of $_____ to be used solely for the purposes of thei [sic] Escorw [sic] Agreement. Lender hereby agrees that said sum will be available and deposited with BOH for the purposes of this Escrow Agreement upon 10 days written notice. BOH is willing to give such notice within sufficient time to accomplish the acquisition of Exchange Properties as provided herein or for distribution to [the Schmidts] prior to the termination of thei [sic] Escrow Agreement, as the case may be, and to receive such funds and administer them in accordance with the terms hereof. Lender and [the Coopers] acknowledge that said unconditional commitment is irrevocable and may not be

amended or terminated without the consent of [the Schmidts].

The LEA provides in relevant part as follows:

9. It is agreed that time is of the essence of this agreement. In the event [the Coopers fail] to perform in accordance with the provisions of this agreement, and becomes in default in respect thereof, then the [Schmidts] shall be entitled to exercise all remedies available under law, including but not limited to the right to bring an action for damages, including without limitation costs and reasonable attorney's fees, for breach of agreement and/or to sue for specific performance of this agreement. It is expressly agreed that [the Schmidts'] rights under this paragr[a]ph shall survive the termination of this Land Exchange Agreement.

On July 28, 1978, Territorial Savings and Loan Corporation (Territorial Savings) issued to the Coopers a $54,000 loan commitment which required closing to occur no later than September 11, 1978. A copy of this letter was sent to King Escrow.

In August 1978, Mr. Schmidt decided to change escrows and personally transferred the Cooper-Schmidt documents from King Escrow to BOH Escrow. Included in the transferred documents was Territorial Savings' loan commitment.

Also in August 1978, the Coopers paid $15,500 to BOH Escrow which was added to the $1,000 deposit they initially paid upon execution of the DROA.

On or about August 31, 1978, Mr. Schmidt advised BOH Escrow that the Schmidts were unwilling to close on a straight purchase basis and that the transaction had to be on a land exchange basis.

On February 7, 1979, Mr. Cooper wrote to Mr. Schmidt: In that I have had no word from either Bank of Hawaii Escrow or yourself in regard to closing of the sale on the above unit, I thought it best to advise you of the following.

As per the Land Exchange Agreement and Escrow Agreement dated June 28, 1978, it is my intention to complete the purchase and closing of this transaction no later than June 15, 1979.

This is to further advise you that no additional time extensions will be granted.

Mr. Schmidt did not respond. On the same day, Mr. Cooper wrote to BOH Escrow:

I expect that the above escrow will close no later than June 15th, 1979. If Mr. Schmidt fails to perform I then expect you to act in accordance with Paragraph 3 in the "Land Exchange Agreement dated June 28, 1978", of which a copy is attached.

Although Mr. Cooper sent a copy of this letter to him, Mr. Schmidt did not respond.

On February 12, 1979, BOH Escrow wrote to Mr. Cooper:

To date we have not received designation of an exchange property from Tom Schmidt, and for tax reasons he has been unwilling to proceed with documentation on a straight purchase.

&ast; &ast; &ast;

I have been unable to reach him by telephone to discuss this so will request a response by copy of this letter.

Although BOH Escrow sent a copy of this letter to him, Mr. Schmidt did not respond.

On April 10, 1979, Jac Kean, a real estate salesman, who at the time of the execution of the DROA was employed by the Schmidts' broker, Tom Schmidt Realtors, wrote in part to Mr. Cooper:

I have spoken with Tom Schmidt recently to find out what his true position is. He claims that he is trying to work a trade for Molokai property.

On May 16, 1979, the Schmidts cancelled the transaction because (1) they never indicated that the loan commitment was the satisfactory equivalent of cash, (2) the full purchase price had not been paid over to them promptly after August 31, 1978, and (3) they did not extend the August 31, 1978 deadline.

On or about May 25, 1979, Territorial Savings issued to the Coopers a $47,250 loan commitment good through July 5, 1979.

On June 5, 1979, Mr. Cooper wrote in part to BOH Escrow:

Please advise immediately the amount of cash needed to be

deposited into escrow and I will have it transferred to the Bank of Hawaii.

On June 22, 1979, Mr. Cooper paid $5,825.05 to BOH Escrow.

The Schmidts having refused to perform, the Coopers sued them for specific performance and for costs and attorney's fee.

The lower court ruled in favor of the Coopers and ordered the Schmidts to specifically perform and to pay the Coopers' "costs and attorney's fees. . .in the amount of $12,311.85."

On appeal, the Schmidts challenge the lower court's findings and conclusions that they, by their actions, indicated that the loan commitment was the satisfactory equivalent of cash and that the Coopers from August 31, 1978 were "ready, willing and able to perform in accordance with the. . .agreements[.]"

Although this case was tried before *Kaiman Realty Inc. v. Carmichael,* 2 Haw. App. 499, 634 P.2d 603 (1981), *rev'd in part,* 65 Haw. 637, 655 P.2d 872 (1982), *supplemented on reconsideration,* 66 Haw. 103, 659 P.2d 63 (1983), and *Scotella v. Osgood,* 4 Haw. App. 20, 659 P.2d 73 (1983), the rules in those cases apply in this case.

In the LEA, the parties specified that time was of the essence. If time was "truly of the essence," then the Coopers may have materially breached the agreement. Even if the Coopers materially breached the agreement, however, they may still be awarded specific performance if the trial court, in the exercise of its equitable discretion and subject to the rules outlined in *Scotella, supra,* decides to award specific performance.

Understandably, the lower court answered some but not all of the questions that must be answered in this kind of case. The record, however, is such that we can supply the missing answers. The questions and the answers are as follows:

1. Whether time was "truly of the essence." Yes.

2. Whether, viewed under the rules applicable to actions at law, the Coopers materially breached the contract. Yes.

3. Whether the Coopers' breach was due to gross negligence or to deliberate or bad faith conduct. No.

4. Whether the Schmidts have been injured by the breach. No.

5. Whether the Schmidts can reasonably and adequately be compensated for their injury, if any, caused by the breach, if any. Not applicable.

6. Whether an inequitable forfeiture would result to the Coopers if specific performance is denied. Yes. The value of Kaleialoha apartment no. 409 had increased substantially.

7. Whether in the exercise of its equitable discretion, the trial court will decree specific performance notwithstanding the Coopers' material breach thereof. Yes.

8. What other discretionary equitable relief, if any, the trial court will grant or deny to either party. None.

The Schmidts also challenge the order requiring them to pay the Coopers' attorney's fee. They point out that the June 28, 1978 LEA provides for an award of an attorney's fee only to them, if successful, not to the Coopers, even if they are successful.

Pursuant to Act 194, 1955 Hawaii Sess. Laws, Section 219-16.5 of the Revised Laws of Hawaii 1955, read in relevant part as follows:

219.16.5. Attorney's fees, when provided for in promissory notes, etc. Any other law to the contrary notwithstanding, where an action instituted in the district court on a promissory note or other contract in writing provides for an attorney's fee, the following rates shall prevail:

By Act 218, 1959 Hawaii Sess. Laws, that section was amended to read in relevant part as follows:

607-17 Attorney's fees when provided for in promissory notes, etc. Any other law to the contrary notwithstanding, where an action is instituted in the district or circuit court on a promissory note or other contract in writing which provides for an attorney's fee the following rates shall prevail and shall be awarded to the successful party, whether plaintiff or defendant:

Senate Standing Committee Rep. No. 623, 13th Territorial Legislature, Reg. Sess. (1959), explained the reason for the amendment as follows:

Your Committee believes that it is unfair on a suit on an instrument which provides for any attorney's fees, to permit the plaintiff to recover such fees from the defendant if plaintifff is successful while permitting the defendant to

recover only the modest attorney's commissions if the defendant obtains judgment in his favor. It is frequently more expensive for a defendant to defend an action successfully than for the plaintiff to prosecute his action.

Your Committee has therefor also amended the Bill to permit either successful party to recover attorney's fees as provided by the instrument, subject to the limitations as set forth in the Bill.

Accordingly, under Hawaii Revised Statutes section 607-17 (1976), if a written contract authorizes an attorney's fee for one party, if successful, then the other party is, *ipso facto,* also entitled to an attorney's fee, if successful.

Affirmed.

*Paul Maki* (*Maki & Gilbert* of counsel) for appellants.
*John A. Chanin* for appellees.