PR PENSION FUND and ALFRED ANTHONY, Plaintiffs–
Appellees, Cross–Appellants, v. DONALD T. NAKADA,
Defendant–Appellant, Cross–Appellee, and JOHN DOES
1–10, JANE DOES 1–10, DOE ASSOCIATIONS 1–10,
DOE PARTNERSHIPS 1–10, and DOE CORPORATIONS
1–10, Defendants

NO. 14151

(CIV. NO. 87–1365)

APRIL 19, 1991

BURNS, C.J., HEEN, AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

This litigation involves a standard form Deposit, Receipt, Offer and Acceptance contract (DROA) between plaintiffs PR Pension Fund (Fund) and Alfred Anthony (Anthony) (collectively Plaintiff), as Buyer, and defendant Donald T. Nakada (Nakada or Defendant), as Seller, in a real estate transaction. Defendant appeals the trial court's judgment ordering specific performance of the DROA in question in favor of Plaintiff. Plaintiff cross–appeals the trial court's conclusion that Plaintiff breached the DROA by not closing the purchase on the date specified therein and its order requiring Plaintiff to pay Defendant certain amounts in addition to the purchase price specified in the DROA.

We conclude that the trial court abused its discretion in ordering specific performance under the circumstances in this case. We therefore vacate the judgment and remand the case for further proceedings.

## I. FACTS
### A. The Parties and the Property

The Fund is a self–directed defined benefit pension plan. Anthony, the trustee and sole beneficiary of the Fund, is a real estate broker and developer.

Nakada is the sole owner of certain real property on Koali Road in Honolulu (Property). The Property consists of 37,830 square feet of fee simple land improved with nine small cottages in dilapidated condition. Nakada, an experienced investor in and developer of residential and commercial properties, listed the Property for sale at $750,000.

## B. The Agreements

On April 17, 1986, Plaintiff submitted a DROA to Clayton S. Nakama (Nakama), the listing broker, offering to purchase the Property for $575,000, with closing specified for September 30, 1986. The offer was subject to Plaintiff receiving an "existing use permit" by August 1, 1986. Nakada counteroffered, increasing the required deposit from $5,000 to $20,000 and obligating Plaintiff to conclude the purchase or forfeit the $20,000 deposit if the "existing use permit" allowed at least eight units. Plaintiff accepted the counteroffer and deposited the $20,000 with escrow.

Plaintiff considered a condominium development of nine residential units on the Property. Plaintiff reasonably understood and believed that the prospective lenders required a recorded Declaration of Horizontal Property Regime (HPR) in order to obtain a loan. Consequently, on July 10, 1986, Plaintiff entered into a letter agreement (July 10, 1986 Agreement) with Nakada. It provided in part as follows:

> [Plaintiff] hereby agrees to pay [Nakada] $1,000.00 (check enclosed) as consideration of [Nakada's] cooperation and signature for [Plaintiff's] HPR Final Public Report.

Exhibit P–16.

In the interim, Plaintiff sought to obtain an existing use permit for the Property from the Department of Land Utilization (DLU) of

the City and County of Honolulu.[1] In late July 1986, Plaintiff learned from the DLU that a portion of the Property was in a flood zone. Neither Nakada nor Nakama disclosed this information to Plaintiff. The DLU informed Plaintiff that demolition and rebuilding within the flood zone were not allowed and recommended that Plaintiff pursue a cluster development permit.

These developments precipitated a renegotiation between the parties. On October 29, 1986, Plaintiff submitted a new DROA, which (1) reduced the purchase price by $25,000 to $550,000; (2) provided for closing on or before December 16, 1986; and (3) included a financing condition of "cash subject to financing within 35 days from acceptance[.]" Exhibit D–6. Nakada attached an Addendum to the new DROA which provided in part as follows:

> 4. Delete Standard Term K[2] on reverse side of DROA. Because of changes in the Federal Tex [sic] Law adverse to [Nakada], this sale must close on or before December 16, 1986. No extensions will be granted. Failure to close on December 16, 1986 will terminate this contract and allow [Nakada] his remedies under Standard Term H.

---

[1] In the application for an "existing use permit" filed with the Department of Land Utilization of the City and County of Honolulu, Alfred Anthony sought to have the existing nine dwellings deemed to be conforming existing uses and sought the issuance of a permit "to rebuild nine new houses" and sell the new houses "in a condominium form of ownership." Exhibit P–17.

[2] Standard Term K is entitled "TIME IS OF THE ESSENCE" and provides that, if either party, for reasons beyond his control, cannot perform by the closing date, such party "can extend closing for no longer than 30 calendar days to allow performance. Thereafter time is of the essence[.]" Exhibit D–6.

*Id.* (footnote added). Plaintiff accepted the Addendum on November 4, 1986. The October 29, 1986 DROA with the Addendum is hereinafter referred to as the "Second DROA."

In late November 1986, Plaintiff's attorney informed Nakada by telephone that Plaintiff's HPR documents were ready for Nakada's signature. Despite the attorney's statement that the documents were necessary in order for Plaintiff to obtain financing, Nakada refused to sign.

On December 14, 1986, Anthony wrote to Nakama, requesting an extension of the closing date. On December 17, 1986, Nakama wrote to Anthony and to escrow, terminating the Second DROA "because the sale was not closed on or before December 16, 1986[.]" Exhibits P–38 and P–39.

## C. The Lawsuit

On April 27, 1987, Plaintiff filed a complaint against Nakada, seeking specific performance and, in the alternative, damages for breach of contract.[3]

After a bench trial, on September 20, 1989, the trial court entered its Findings of Fact (FOF), Conclusions of Law (COL) and Judgment. The court found that Nakada breached both the July 10, 1986 Agreement and his covenant of good faith under the Second DROA by refusing to sign the HPR documents. FOF 69 and 70. However, the court also found that Plaintiff breached the Second DROA by failing to close on December 16, 1986. FOF 78. The court decreed specific performance of the Second DROA, and ordered Plaintiff to pay to Nakada, in addition to the purchase price, the additional capital gains taxes to be incurred by Nakada because the transaction did not close on or before December 31,

---

[3] The complaint also sought punitive damages.

1986, and interest at ten percent per annum on the net proceeds of the sale from December 16, 1986.

Nakada's appeal and Plaintiff's cross–appeal followed.

## II. ISSUES
### A. Nakada's Appeal

Nakada's primary contention on appeal is that the trial court abused its discretion in ordering specific performance in the case. His subsidiary contentions are that the trial court erred in finding that (1) the financing condition in the Second DROA was solely for the benefit of Plaintiff which Plaintiff waived, FOF 75; (2) the July 10, 1986 Agreement was a separate contract between the parties, which survived the execution of the Second DROA, FOF 64 and 65; and (3) Nakada breached his covenant of good faith under the Second DROA. FOF 70.

Regarding Nakada's subsidiary contentions, we conclude that the challenged findings referred to above and others specified in the opening brief[4] are not clearly erroneous. *Gadd v. Kelley*, 66 Haw. 431, 442, 667 P.2d 251, 259 (1983); *DeMund v. Lum*, 5 Haw. App. 336, 338, 690 P.2d 1316, 1318–19 (1984).

The specific performance issue raised by Nakada is discussed in Part III, *infra*.

### B. Plaintiff's Cross–Appeal

Plaintiff contends that the trial court erred in finding and concluding that Plaintiff breached the Second DROA, FOF 78 and COL 2.b, and in ordering Plaintiff to pay amounts in addition to the purchase price for the Property.

---

[4] The other challenged findings of fact (FOF) are FOF 69, 76, 77, 78, and 79.

The issue relating to Plaintiff's breach is addressed in Part IV, *infra*.

## III.  SPECIFIC PERFORMANCE

Despite concluding that time was of the essence and that Plaintiff had breached the Second DROA, the trial court also concluded that (1) Plaintiff's breach was not due to "Plaintiff's gross negligence or to deliberate or bad faith conduct[,]" COL 2.c; (2) Nakada's injury caused by Plaintiff's breach can be "reasonably and adequately . . . compensated[,]" COL 2.d; and (3) Plaintiff will "incur an inequitable forfeiture if specific performance is denied[.]" COL 2.e.  Based on those conclusions, the court granted specific performance in Plaintiff's favor.

Nakada challenges COL 2.c, 2.d, and 2.e, and contends that the trial court abused its discretion in granting specific performance.  Based on the trial court's findings, we conclude that the court abused its discretion in ordering specific performance.  However, as discussed in Part VI, *infra*, the court could have exercised its discretion in fashioning another remedy.

### A.  The Jenkins and Kaiman Cases

In the seminal case of *Jenkins v. Wise*, 58 Haw. 592, 574 P.2d 1337 (1978), which involved the breach of certain agreements of sale by the purchasers, the supreme court stated:

> [W]here the vendee's breach has not been due to gross negligence, or to deliberate or bad–faith conduct on his part, and the vendor can reasonably and adequately be compensated for his injury, courts in equity will generally grant relief against forfeiture and decree specific performance of the agreement.

*Id.* at 597, 574 P.2d at 1341. The supreme court reversed the lower court's judgment decreeing the cancellation of the agreements of sale and denying the purchasers' counterclaim for specific performance.

The supreme court clarified and extended the *Jenkins* principles in *Kaiman Realty, Inc. v. Carmichael,* 65 Haw. 637, 655 P.2d 872 (1982) (*Kaiman I*), *aff'd on reconsideration,* 66 Haw. 103, 659 P.2d 63 (1983) (*Kaiman II*). In *Kaiman I,* the court reaffirmed its "holding in *Jenkins* that a 'time is of the essence' clause in an agreement of sale will not foreclose equitable relief where, absent gross negligence or bad faith conduct of the vendee, forfeiture would be harsh and unreasonable." 65 Haw. at 640, 655 P.2d at 874. In *Kaiman II,* the court extended the *Jenkins* principles, as reaffirmed in *Kaiman I,* to DROAs. The court stated:

> It may be that under many or most short–term DROA contracts, the purchaser's immediate equitable interest is so slight that it would not be inequitable to deny all relief to the purchaser upon a showing of the purchaser's default. Also, a "time is of the essence clause" could carry relatively substantial weight upon default under a short–term DROA contract. However, the title of the land purchase contract, whether DROA or agreement of sale, is not itself dispositive.

66 Haw. at 104, 659 P.2d at 64.

In the case at bar, the trial court applied the *Jenkins* principles, as directed by *Kaiman II,* and decreed specific performance of the Second DROA.

## B. The Ready, Willing, and Able Purchaser

Where a purchaser seeks specific performance of a land purchase contract, the general rule provides that he must show that (1)

he paid the purchase price or tendered it to the seller or (2) he has a good excuse for his failure to so pay or tender and has the readiness, willingness, and ability to pay. 71 Am. Jur. 2d *Specific Performance* § 65 (1973). The seller's repudiation, including anticipatory repudiation, excuses tender of payment by the purchaser. *Am–Cal Inv. Co. v. Sharlyn Estates, Inc.*, 255 Cal. App. 2d 526, 539, 63 Cal. Rptr. 518, 527 (1967); *Gaffi v. Burns*, 278 Or. 327, 333, 563 P.2d 726, 729 (1977). *See also* 71 Am. Jur. 2d *Specific Performance* § 66 (1973). Such repudiation, however, does not excuse the purchaser from pleading and proving that he is ready, willing, and able to perform his obligations under the contract. *Am–Cal Inv. Co.*, 255 Cal. App. 2d at 539, 63 Cal. Rptr. at 527; *Romaniello v. Pensiero*, 21 Conn. App. 57, ____, 571 A.2d 145, 147 (1990); *Gaffi*, 278 Or. at 333, 563 P.2d at 729.

In the case at bar, the trial court found Nakada to be in breach of both the July 10, 1986 Agreement and the Second DROA. Because Nakada breached the Second DROA, Plaintiff was excused from a tender of payment due under the Second DROA. However, in seeking specific performance, Plaintiff was not excused from pleading and proving that Plaintiff was ready, willing, and able to perform under the Second DROA. Plaintiff alleged in the complaint that Plaintiff was "ready, willing and able to fully and timely perform its obligations under the [Second DROA]." Record, Vol. 1 at 5. However, Plaintiff failed to prove this at trial. The trial court found that on November 15, 1986, Plaintiff received a loan commitment from IBI Financial Services, Inc. (IBI Financial), but "did not further pursue the loan with IBI Financial because of [Plaintiff's] on–going lending relationship with GECC [Financial Corporation (GECC Financial)]." FOF 27 and 28. Plaintiff never obtained a loan commitment from GECC Financial. There was no evidence of Plaintiff's ability to pay the purchase price. Consequently, the trial court could not "make any finding concerning whether Plaintiff would have been ready, willing and

able to close on December 16, 1986 had Defendant not hindered Plaintiff from obtaining the recorded HPR[.]" FOF 79.

Because Plaintiff failed to prove that Plaintiff was ready, willing, and able to timely close, we conclude that the trial court abused its discretion in ordering specific performance of the Second DROA.

Plaintiff argues, however, that *Jenkins* and *Kaiman I* and *II* do not require a showing of payment, tender of payment, or ability to pay by the purchaser as a prerequisite for specific performance. We disagree.

In *Jenkins* and the *Kaiman* case, whether the purchasers paid, tendered, or were ready, willing, and able to perform was not at issue. In *Jenkins*, the supreme court stated that "from and after November 15, 1972, the Wells were always ready, willing and able to perform." 58 Haw. at 601, 574 P.2d at 1343. The Wells were the buyers of the parcels of land which Wise and Ehrensberger, the purchasers, were purchasing under the agreements of sale. The court stated that the initial payment to be made by the Wells "would have been more than sufficient to satisfy in full the Jenkins agreements of sale[.]" *Id.*

In the *Kaiman* case, the closing date of the six separate DROAs for the sale of six apartments was October 16, 1978. Each DROA provided for a down payment of $15,000 and the balance of $60,000 by way of an agreement of sale. The facts related in this court's opinion show that the down payment and signed agreements of sale for each of the apartments were received by escrow within three days of October 16, 1978. *Kaiman Realty, Inc. v. Carmichael*, 2 Haw. App. 499, 501, 634 P.2d 603, 606 (1981).

Plaintiff also refers to two of our cases, *Scotella v. Osgood*, 4 Haw. App. 20, 659 P.2d 73 (1983), and *Cooper v. Schmidt*, 4 Haw. App. 115, 661 P.2d 724 (1983). In these cases, however, the buyers' performance, tender, or readiness, willingness, and ability to perform was again not at issue. In *Scotella*, the buyers under a

DROA "deposited all necessary funds and documents with escrow" seventeen days after the agreed upon closing date. 4 Haw. App. at 22, 659 P.2d at 75. In *Cooper*, the buyers under a land exchange agreement obtained a loan commitment from a savings and loan institution and deposited the balance of the purchase price with escrow.

Neither the supreme court nor this court has rejected the equitable principle requiring a purchaser, who seeks specific performance under a land purchase contract, to show that he has paid the purchase price, tendered performance, or is ready, willing, and able to perform the contract.

## IV. PLAINTIFF'S BREACH

The question of whether Plaintiff breached the Second DROA is not vital to determining whether Plaintiff is entitled to specific performance under the *Jenkins* principles. *See* Part III, *supra.* However, as a general rule, "a party cannot recover for a breach of contract if he fails to comply with the contract himself[.]" 17A Am. Jur. 2d *Contracts* § 617, at 625 (1991). Consequently, the issue of Plaintiff's breach is crucial in determining whether Plaintiff is entitled to damages for Nakada's breach, which Plaintiff alternatively sought in the complaint.

The trial court found that "the Addendum did make time of the essence[]" under the Second DROA. FOF 63. Therefore, the court found that "Plaintiff breached the contract by failing to close on December 16, 1986[.]" FOF 78.

Plaintiff does not dispute the finding that time was of the essence under the Second DROA. Plaintiff cites, however, *Restatement (Second) of Contracts* § 237 (1981), which provides as follows:

> Except as stated in § 240 [which deals with part performances], it is a condition of each party's remaining duties to render performances to be exchanged under an exchange of promises that there be no uncured material failure by the other party to render any such performance due at an earlier time.

Plaintiff's premise is that Plaintiff's promise to pay the purchase price for the Property as stipulated in the Second DROA and close the transaction on or before December 16, 1986, and Nakada's promise under the July 10, 1986 Agreement to sign Plaintiff's HPR documents were exchanged promises. Plaintiff's performance of Plaintiff's promise was conditional on Nakada's performance of his promise which was due at an earlier time. Therefore, Plaintiff contends that Nakada's nonperformance of his promise excused or suspended Plaintiff's performance. In our view, Plaintiff's application of § 237 is flawed.

First, the record does not support Plaintiff's claim of exchanged promises. The trial court found that "the July 10, 1986 letter was a separate and distinct contract, . . . the purpose of which was to assist Plaintiff's development of the [P]roperty." FOF 65. The court did not find that the purpose of the July 10, 1986 Agreement was to assure Plaintiff of obtaining a loan for the purchase of the Property. In reality, the actual exchanged promises were (1) Plaintiff's promise to pay the purchase price for the Property on or before December 16, 1986, and (2) Nakada's promise to convey the Property to Plaintiff under the Second DROA. Nakada's breach of the July 10, 1986 Agreement "did not relate to an essential element of the [Second DROA] and, therefore, was not a material breach." *McEachren v. Sherwood & Roberts, Inc.*, 36 Wash. App. 576, 580, 675 P.2d 1266, 1269 (1984).

Second, although FOF 37 and 38 seem to indicate that Plaintiff's purpose for the July 10, 1986 Agreement was to meet a requirement of prospective lenders in obtaining financing for the

Property, the record and the trial court's findings do not support Plaintiff's argument that Plaintiff's performance was conditional on Nakada's earlier performance under the July 10, 1986 Agreement. The Second DROA contained a special condition of "cash subject to financing within 35 days from acceptance[.]" The special condition was "solely for the benefit of Plaintiff . . . [that] could be waived unilaterally by the Plaintiff at Plaintiff's option." FOF 75. When Plaintiff did not obtain financing within the stipulated time, "Plaintiff waived the condition and proceeded with the contract." FOF 76. In our view, after Plaintiff waived the financing condition, Plaintiff's promise to pay cash on or before December 16, 1986, was no longer dependent on, but was independent of, Nakada's promise to sign the HPR documents. *See* 17A Am. Jur. 2d *Contracts* § 617 (1991).

Third, the court also found that Nakada breached an implied "covenant of good faith [in the Second DROA] when he refused to sign the HPR documents." FOF 78. As stated above, Plaintiff's performance was not dependent or conditional on Nakada's performance of his promise to sign the HPR documents. Thus, Nakada's breach of the covenant of good faith, resulting from his refusal to sign the HPR documents, was not a material breach of the Second DROA, and did not excuse Plaintiff's nonperformance of Plaintiff's promise to pay the purchase price on the closing date under the Second DROA.

In other words, Plaintiff had a duty to perform under the Second DROA despite Nakada's breach of the July 10, 1986 Agreement and of the implied covenant of good faith under the Second DROA by his refusal to sign Plaintiff's HPR documents. Accordingly, the trial court did not err in finding that Plaintiff breached the Second DROA "by failing to close on December 16, 1986[.]" FOF 78. Plaintiff's breach precludes Plaintiff's recovery of damages from Nakada under the Second DROA.

## V. PLAINTIFF'S CLAIM FOR DAMAGES

The trial court found that the July 10, 1986 Agreement was "a separate and distinct contract," FOF 65, which Nakada breached by his "refusal to sign the HPR documents[.]" FOF 69. We concluded in Part IV, *supra*, that Nakada's promise under the July 10, 1986 Agreement and Plaintiff's promise under the Second DROA were not exchanged promises, but were independent of, rather than dependent on, each other.

Where a contract "has been executed on one side, the obligation of the other party to perform his part of the contract is clear." 17A Am. Jur. 2d *Contracts* § 609, at 616 (1991). Here, Plaintiff executed his part of the bargain under the July 10, 1986 Agreement by paying Nakada $1,000. Thereupon, Nakada was obligated to perform his part of the bargain, which he refused to do. Under those circumstances, Plaintiff was entitled to damages for Nakada's breach of the July 10, 1986 Agreement. *See Hanks v. GAB Business Servs., Inc.*, 644 S.W.2d 707 (Tex. 1982).

Accordingly, upon remand, the circuit court should determine the amount of damages Plaintiff is entitled to for Nakada's breach of the July 10, 1986 Agreement.

## VI. FASHIONING AN APPROPRIATE DECREE

"[A] trial court has the plenary power to fashion a decree to conform to the equitable requirements of the situation." *Jenkins*, 58 Haw. at 598, 574 P.2d at 1342 (citing *Fleming v. Napili Kai, Ltd.*, 50 Haw. 66, 430 P.2d 316 (1967)). Where specific performance is sought, "the court has power to properly adjust all equities[.]" *Continental Developers, Ltd. v. Hensel*, 57 Haw. 570, 573, 560 P.2d 1306, 1309 (1977). Thus, the denial of specific performance does not preclude a court from fashioning some other equitable remedy.

Here, the trial court found both Plaintiff and Nakada to be in breach, but concluded that the *Jenkins* principles permitting specific performance were present in the case. However, Plaintiff failed to prove that Plaintiff was ready, willing, and able to perform. Under such circumstances, the court should have denied specific performance of the Second DROA. However, since the court concluded that Plaintiff's breach was not due to gross negligence or bad faith conduct and that Plaintiff would incur an inequitable forfeiture, the court, in its discretion, could have granted Plaintiff some equitable relief, other than specific performance. For example, it could have ordered the return of the $20,000 deposit in escrow to Plaintiff and ordered Defendant to reimburse to Plaintiff all or a portion of Plaintiff's expenses of $13,423 incurred in the aborted transaction.[5]

## VII. CONCLUSION

Accordingly, we vacate the Judgment portion of the September 20, 1989 Findings of Fact, Conclusions of Law and Judgment, and direct the trial court, upon remand, to enter a judgment:

1. Denying specific performance in favor of Plaintiff;

2. Denying Plaintiff any damages for Defendant's breach of the Second DROA;

3. Awarding Plaintiff damages for Defendant's breach of the July 10, 1986 Agreement in such amount as it may determine; and

4. Ordering equitable relief in favor of Plaintiff, other than specific performance, if any, which it deems proper, in its discretion.

---

[5] Where a court declines to grant specific performance to a purchaser under an agreement of sale, "it may nevertheless order the return of that portion of the purchase price already paid which it finds would constitute a penalty[.]" *Jenkins v. Wise*, 58 Haw. 592, 598, 574 P.2d 1337, 1341–42 (1978).

Judgment vacated and case remanded for further proceedings consistent with this opinion.

*Bert T. Kobayashi, Jr.* (*David L. Monroy* with him on the briefs; Kobayashi, Watanabe, Sugita, Kawashima & Goda, of counsel) for defendant–appellant, cross–appellee.

*Paul A. Schraff* (Dwyer Imanaka & Schraff, Attorneys at Law, A Law Corporation) for plaintiffs–appellees, cross–appellants.